## BARMET OF KENTUCKY, INC., Appellant,

### v.

### Edith D. SALLEE, widow of James R. Sallee: and Workmen's Compensation Board, Appellees.

Court of Appeals of Kentucky.

March 14, 1980.

Rehearing Denied May 2, 1980.

Discretionary Review Denied Oct. 7, 1980.

Richard M. Joiner, Mills, Mitchell & Turner, Madisonville, for appellant.

Phillip G. Abshier, Cooper, Flaherty, Bamberger & Abshier, Owensboro, for Edith D. Sallee, widow of James R. Sallee.

Before BREETZ, GANT and VANCE, JJ.

BREETZ, Judge.

This is an appeal from a judgment which affirmed, with modification, an award of the Workmen's Compensation Board to the appellee, as widow of James Ronald Sallee and as mother of their two children. The modification ordered by the lower court was necessary in order to correct two mathematical errors made by the board. The judgment of the circuit court ordered the board to modify the award by increasing it to $104.00 per week and, finding that there was sufficient evidence in the record to support the board's finding that the employer was to be assessed the 15% increase, properly computed the penalty to be $15.60 per week.

The appellant contests the imposition of the penalty upon it and the refusal of both the board and the lower court to award a 15% reduction under KRS 342.165. We affirm the denial of the 15% reduction, but we reverse the imposition of the 15% penalty on the employer.

The decedent, James Ronald Sallee, was employed as a shift production supervisor at appellant's Livia, Kentucky plant. He worked the midnight to eight o'clock shift, and on June 28, 1977, a machine referred to as an "exploder" jammed. The testimony indicated that when this occurs, it usually results in a blown fuse. Fellow employees testified that the decedent remarked that he was going to inspect the problem. After a short period of time, Mr. Sallee's body was found in front of an electrical cabinet in the production control room. This room contains the electrical control units for the operating equipment in the plant including the malfunctioning exploder. The body was found in front of the electrical cabinet which contained the fuses for the exploder. This cabinet door was found open. One fuse had been removed and another was partially removed. The floor of the control room was wet or moist. The board's find-

ing that Mr. Sallee was electrocuted while changing a fuse is not challenged.

The appellee requested the board to assess the penalty against the appellant both for its alleged violation of KRS 338.-031(1)(a) which requires an employer to ... furnish to each of his employes employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employes

and for its alleged violation of 29 CFR § 1910.22(a)(2)[1] which reads as follows:

(a) *Housekeeping.*

(2) The floor of every workroom shall be maintained in a clean, and *so far as possible,* a dry condition. Where wet processes are used, drainage shall be maintained, and false floors, platforms, mats, or other dry standing places should be provided where practicable. (emphasis added)

The appellee argued before the board that appellant violated KRS 338.031(1)(a) by its failure to provide its employees with fuse–pullers. The board rejected that argument on the ground that there is no regulation requiring the employer to furnish fuse–pullers and on the further ground that KRS 338.031(1)(a) is too vague to meet the requirement of KRS 342.165 that the statute alleged to have been violated be specific. There was no appeal from that ruling and, therefore, that issue is not before us.

The board, however, found appellant to be in violation of 29 CFR § 1910.22(a)(2) and assessed the penalty for that violation. The board's findings on this issue were:

11. ... Next the defendant argues the failure of the plaintiff to show a willful intention to violate a specific safety standard. We find this argument is without merit. The defendant's plant manager admitted awareness of the OSHA requirement of providing a clean and dry surface.

12. A careful review of the record supports a finding that the plaintiff is entitled to the 15% penalty under KRS 342.165. Our finding is based on the fact that the leaky condition of the roof was known to the defendant prior to the electrocution of Mr. Sallee, that the wet conditions in the electrical room were known to the defendant prior to Sallee's death, that the employer was aware of the specific OSHA requirements and that the failure of the employer to comply contributed to the death of Mr. Sallee.

■ Appellant asks that we reconsider our holding in *Childers v. International Harvester Co.,* Ky.App., 569 S.W.2d 675 (1977) and overrule it. We have reconsidered that decision and continue to adhere to its reasoning and holding that KRS 338.-021(2) does not prohibit the assessment of a penalty under the Workmen's Compensation Act for a violation of a regulation promulgated under the Kentucky Occupational Safety and Health Act, KRS Ch. 338. This does not mean, however, that every violation by an employer of a regulation promulgated under statutory authority should result in an increase in the employer's liability under the Workmen's Compensation Act for KRS 342.165 requires an *"intentional* failure of the employer to comply with any specific statute or lawful regulation made thereunder".

■ We know, through *Gibbs Automatic Moulding Company v. Bullock,* Ky., 438 S.W.2d 793 (1969), that either the employer must know that the regulation exists or the regulation must have been in existence long enough to create a presumption of knowledge before the employer may be assessed a penalty for its violation. Appellant concedes its knowledge of the regulation before the time Mr. Sallee was killed. It argues that, before it can be charged with an intentional failure under KRS 342.165, the board must find that it failed to attempt to comply with the regulation.

We are asked, in this case, to define intentional failure. We note that neither "in-

---

1. Adopted by 803 Kentucky Administrative Regulations (KAR) 2:020.

tentional" nor "intention" is defined in the compensation act but intention is also used in KRS 342.610. Webster[2] defines intention as "a determination to act in a certain way or to do a certain thing; purpose; design". Another lexicographer[3] states that intention is "a settled direction of the mind toward the doing of a certain act". The Penal Code states that a person acts intentionally "when his conscious objective is to cause . . ." KRS 501.020(1).

■ Larson points out[4] that courts are often very restrictive in interpreting misconduct provisions of compensation statutes when the result is a loss of all benefits such as in KRS 342.610(3) and (4) and should be more "straightforward" when the result is a penalty. Neither we nor the Workmen's Compensation Board are free to apply a less rigorous standard for the imposition of a penalty than the standard mandated by the legislature. In Kentucky, in penalty cases, the standard is an intentional failure. It applies both to employees and employers.

The question before the board in this case was: "Did the appellant determine to act in such a way that the regulation would be violated?" An examination of the findings of the board reveal that it:

(1) Did not make a finding that the appellant had failed, *so far as possible*, to keep the floor dry;

(2) Equated knowledge of the regulation and the fact that the floor was wet or moist to be a violation when the regulation clearly states that the appellant's duty was only "so far as possible", and

(3) Did not explicitly find the appellant's failure to comply with the regulation to be intentional except, inferentially, by its finding that the appellee was entitled to the 15% penalty.

■ Our task, on appeal from the circuit court, is to determine whether the lower court was clearly erroneous in its finding that the board's award was supported by substantial evidence. We find no substantial evidence to support the board's imposition of the 15% penalty and find uncontradicted evidence negating such a finding. Therefore, we reverse. *Collins v. Castleton Farms, Inc.*, Ky.App., 560 S.W.2d 830 (1977).

Our examination of the record shows conflicting testimony as to the cause of the wet condition of the floor on that evening. Some attributed it to the fact that it was raining outside and water was tracked in; some thought it was due to humidity; others thought it was the result of a leak either in the roof or in another portion of the building. Of those who thought it was a leak, some thought the leak had been present since the spring of 1977 and others thought the leak was not known to exist until after Mr. Sallee's unfortunate death. There was, in our opinion, uncontradicted testimony from those who acknowledged the existence of the leak before Mr. Sallee's death that the appellant had been making efforts to locate and repair it.

Appellee argues that there was testimony that appellant intentionally failed to keep the floor dry, so far as possible. The only testimony to which we are referred is the testimony of the maintenance electrician, Cecil Eden. Mr. Eden testified under cross-examination by appellant:

Q. You mentioned, I think about a leak in the roof?

A. There was a small leak.

Q. Are you familiar with any efforts that have been taken to correct that leak?

A. Yes, I finally corrected it myself.

Q. And were those efforts being taken before Mr. Sallee's death?

A. I don't think so. It wasn't all that bad. It seems it was after that.

Q. When was the leak first noticed?

A. I believe after the accident.

---

2. Webster's New International Dictionary, Unabridged 2d Edition (1951).

3. Funk & Wagnall's Standard Dictionary, International Edition (1961).

4. 2A Larson, Workmen's Compensation Law, § 70.20.

On redirect examination by the appellee, the following exchange took place:

Q. Do you know of your own knowledge whether or not the roof leaked at the time of the accident?

A. No, I don't.

Q. I don't mean that it was leaking at that particular instant, but you were having problems with the roof sometime before Ronnie Sallee was killed?

A. Not as I know of.

The answer, "I don't think so", of this witness, coupled with his admission that he was unaware of the existence of the problem with the leak before Mr. Sallee's death, does not contradict the unequivocal testimony in this record that efforts had been made to find the leak and that corrective measures, including, among others, repair of the siding, had been taken by the appellant before the fatal accident. In summary, although there was proof from which the board may have found appellant to have been negligent in its efforts to repair, there is a complete absence of proof that the appellant intentionally failed to keep the floor, so far as possible, in a dry condition.

Having reached this conclusion, we decline to rule on the appellant's argument that the Workmen's Compensation Board lacks both the authority and expertise to rule whether a KOSHA violation existed[5] and its further argument that the violation, if found to exist, was only a condition leading to, not a cause of, Mr. Sallee's death.

■ The remaining issue raised by the appellant is the failure of the board and the circuit court to order a 15% reduction for Mr. Sallee's intentional failure to use a fuse-puller and his violation of the appellant's rule prohibiting employees of his job classification from changing fuses. The board's finding on this issue was:

13. The defendant-employer argues that it is due a 15% reduction in the award herein pursuant to KRS 342.165 based on the fact that the deceased em-

ployee, Sallee, violated company policy in changing the fuse. That policy apparently was that only maintenance men were to change fuses and Mr. Sallee was a foreman. However, the plaintiff presented ample testimony that even if such a policy existed, it was not enforced or followed as a general policy. Plaintiff presented the testimony of four employees who indicated that both foremen and maintenance men changed fuses. Therefore we find no merit in the employer's request for reduction benefits pursuant to KRS 342.165.

There is ample evidence to support this finding of the board and, we might add, there was substantial evidence that fuse-pullers were not available.

The judgment of the circuit court is affirmed except that portion which awarded a 15% penalty to the appellee which is reversed.

All concur.

---

**5.** *Childers v. International Harvester Co., supra* is not dispositive of this issue. In *Childers*, KOSHA had issued a citation before the board imposed the penalty. This record contains no evidence that the appellant had been cited for a violation of 29 CFR § 1910.22(a)(2).